UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

Plaintiff,

v.

AHMED OTHMAN KADAR,

Defendant.

26cr102 JRT/EMB
**INDICTMENT**

18 U.S.C. § 1347
18 U.S.C. § 2
18 U.S.C. § 1957
18 U.S.C. § 982(a)(7)
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

**THE UNITED STATES GRAND JURY CHARGES THAT:**

At all times relevant to this Indictment:

1.      Medicaid was a health and long-term care coverage program jointly financed by states and the federal government pursuant to the Social Security Act of 1965 that provided benefits to individuals and families who met specified financial and other eligibility requirements, and certain other individuals who lacked adequate resources to pay for medical care. The Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services, was responsible for overseeing Medicaid in participating states, including Minnesota.

2.      Individuals who received benefits under Medicaid were referred to as "recipients."

3.      Medicaid was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

SCANNED
MAY 2 0 2026
U.S. DISTRICT COURT MPLS

*United States v. Kadar*

4.      Each state, including Minnesota, established and administered its own Medicaid program and determined the type, amount, duration, and scope of services covered within broad federal guidelines.

5.      Medicaid covered the costs of medical services and products ranging from routine preventive medical care for children to institutional care for the elderly and disabled. Service providers were authorized to submit claims to Medicaid only for services they actually rendered and were required to maintain patient records verifying the provision of services. By submitting a claim, the provider certified, among other things, that the services were medically necessary, rendered to the patient as represented, and not rendered as a result of kickbacks or bribes.

6.      In Minnesota, Medicaid was administered by the Minnesota Department of Human Services ("DHS").

## A.      Background on Minnesota's Integrated Community Supports ("ICS") Program

7.      In 2021, Minnesota began offering a new Medicaid benefit called Integrated Community Supports ("ICS"). ICS was designed to help people with disabilities live independently in the community rather than in an institutionalized setting such as a group home or assisting living facility.

8.      According to DHS, ICS services consisted of daily one-on-one help with health, safety, and household tasks, including services and training for:

    a.      Community participation, such as help finding things to do, learning to get around, and interpersonal skills;

*United States v. Kadar*

b. Health, safety, and wellness, such as setting up health appointments and learning how to stay healthy and safe;

c. Household management, such as making your home safe, following the rules of your lease, budgeting, and cooking; and

d. Adaptive skills (planning, preparing, and safety), such as crisis prevention, problem-solving, and living safely on your own.

9. DHS covered ICS services for adults who qualified for certain Medicaid waivers that allowed them to receive home- and community-based services as an alternative to institutionalization:

a. The "Brain Injury" waiver provided home- and community-based services to adults with a diagnosis of brain injury who would otherwise require the level of care provided in a specialized nursing facility or neurobehavioral hospital;

b. The "Community Access for Disability Inclusion" waiver provided home- and community-based services to adults with disabilities who would otherwise require the level of care provided in a nursing facility;

c. The "Community Alternative Care" waiver provided home- and community-based services to adults who were chronically ill or medically fragile and would otherwise require the level of care provided in a hospital; and

d. The "Developmental Disabilities" waiver provided home- and community-based services to children and adults with a diagnosis of a developmental disability or a related condition who required the level of care

*United States v. Kadar*

provided in an intermediate care facility for persons with developmental disabilities.

**B.   Defendant and Relevant Individuals and Entities**

10.   In or around October 2021, Individual 1 and Individual 2 filed corporate registration paperwork with the Minnesota Secretary of State to form Ultimate Home Health LLC ("Ultimate").

11.   In or around October 2021, Individual 1 and Individual 2 enrolled Ultimate with DHS for the purpose of being permitted to submit claims to Medicaid.

12.   In or around June 2024, AHMED KADAR assumed control over the operation of Ultimate. AHMED KADAR maintained control of Ultimate through in or around November 2025.

13.   In or around June 2024, Ultimate began submitting claims to Minnesota Medicaid for ICS services purportedly provided beginning in or around April 2024.

**C.   The Scheme to Defraud the ICS Program**

14.   From in or around April 2024 through in or around November 2025, in the District of Minnesota and elsewhere, defendant AHMED KADAR did knowingly devise and participate in a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services.

4

*United States v. Kadar*

15.    It was the purpose of the scheme for AHMED KADAR to unlawfully enrich himself, by, among other things: (a) submitting and causing the submission of false and fraudulent claims to Medicaid (i) that inflated the number of hours of ICS service actually provided and (ii) for ICS services that were not actually provided; (b) concealing the submission of false and fraudulent claims to Medicaid and the receipt and transfer of proceeds of the fraud; and (c) diverting proceeds of the fraud for the personal use and benefit of AHMED KADAR and others, and to further the fraud scheme.

16.    The manner and means by which AHMED KADAR executed the scheme included, among other things, the following:

a.    Ultimate rented an 11-unit apartment complex for the purpose of housing Medicaid recipients for whom Ultimate could bill Medicaid for ICS services.

b.    In or around June 2024, AHMED KADAR was added as a signatory to Bank Account 1, held in the name of Ultimate.

c.    Beginning in or around June 2024, Bank Account 1 began receiving reimbursements from Medicaid for ICS services purportedly provided by Ultimate beginning in or around April 2024.

d.    Beginning in or around June 2024 and continuing through in or around November 2025, AHMED KADAR was responsible for the submission of claims to Medicaid for ICS services purportedly provided by Ultimate to Medicaid recipients between in or around April 2024 and November 2025.

5

*United States v. Kadar*

e.      Between in or around April 2024 and in or around November 2025, AHMED KADAR knowingly and willfully submitted claims to Medicaid for (i) more ICS services than Ultimate provided to Medicaid recipients, and (ii) ICS services that Ultimate did not provide.

f.      AHMED KADAR, by and through Ultimate, knowingly and willfully submitted claims to Medicaid for ICS services, including transportation of Medicaid recipients to medical appointments, that were not actually provided and resulted in Medicaid recipients failing to receive needed medical care.

g.      AHMED KADAR, by and through Ultimate, knowingly and willfully submitted claims to Medicaid for ICS services, when, in fact, he failed to respond to repeated complaints from Medicaid recipients that power had been shut off to their units, resulting in Medicaid recipients being forced to live in units without heat during winter.

h.      On or about March 6, 2025, AHMED KADAR submitted a claim to Medicaid for ICS services provided to Medicaid recipient R.C., who was supposed to be receiving 24-hour care. The claim was in the amount of approximately $461.94, for services purportedly provided on March 6, 2025, the day before R.C. was found deceased, when, in fact these services were not actually provided.

i.      To further the scheme, and in response to complaints of maltreatment by Medicaid recipients, including lack of power and eviction of

6

the chronically homeless, AHMED KADAR created records falsifying the services that Ultimate claimed that it provided to Medicaid recipients.

j.      Between in or around April 2024 and in or around November 2025, AHMED KADAR transferred or wired approximately $630,000 in funds reimbursed to Ultimate by Medicaid for ICS, from Bank Account 1, directly and indirectly, into AHMED KADAR's personal accounts.

k.      From in or around June 2024 through in or around November 2025, AHMED KADAR, through Ultimate, billed Minnesota Medicaid approximately $1.4 million for ICS services purportedly provided to Medicaid recipients and received approximately $1.4 million based on those false and fraudulent claims.

**<u>Counts 1 through 3</u>**
(Health Care Fraud; Aiding and Abetting)

17.     Paragraphs 1 through 16 of this Indictment are re-alleged and incorporated herein.

18.     On or about the dates specified below, in the District of Minnesota and elsewhere, AHMED KADAR, through Ultimate, aided and abetted by others known and unknown to the Grand Jury, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, that is, Medicaid, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, Medicaid, in connection with the delivery of, and payment

*United States v. Kadar*

for, health care benefits, items, and services, by causing the submission of the following false and fraudulent claims to Minnesota Medicaid for ICS services:

| Count | Medicaid Recipient | Medicaid Claim Number | Date of Claimed Service | Approx. Amount Claimed |
|---|---|---|---|---|
| 1 | J.R. | 92505100400042780 | 01/01/2025 | $233.42 |
| 2 | R.C. | 9251490040040344 | 3/06/2025 | $461.94 |
| 3 | K.R. | 9253180040031588 | 11/14/2025 | $375.14 |

(Title 18, United States Code, Sections 1347 and 2.)

### Counts 4 and 5
### (Money Laundering)

19.    On or about the dates set forth as to each count below, in the District of Minnesota and elsewhere, AHMED KADAR, aided and abetted by, and aiding and abetting others known and unknown to the Grand Jury, did knowingly engage, and attempt to engage, in a monetary transaction affecting interstate and foreign commerce by, through, and to a financial institution, in criminally derived property of a value greater than $10,000, and such property having been derived from a specified unlawful activity, that is, health care fraud, in violation of Title 18, United States Code, Section 1347:

8

*United States v. Kadar*

| Count | Description | Approx. Date | Approx. Amount |
|-------|-------------|--------------|----------------|
| 4 | Wire Transfer from Bank Account 1 to Bank Account 2, a business account whose signatory was Individual 3, KADAR's associate. | 9/12/2025 | $300,000 |
| 5 | Wire Transfer from Bank Account 1 to Bank Account 2, a business account whose signatory was Individual 3, KADAR's associate. | 11/19/2025 | $100,000 |

(Title 18, United States Code, Sections 1957(a) and 2)

## FORFEITURE ALLEGATIONS
### (18 U.S.C. § 982(a)(1), 18 U.S.C. § 982(a)(7))

20.     The allegations contained in Counts 1 through 5 of this Indictment are incorporated by reference as if set forth fully herein for the purpose of alleging forfeiture against defendant AHMED KADAR pursuant to the provisions of Title 18, United States Code, Section 982.

21.     Pursuant to Title 18, United States Code, Section 982(a)(7), upon being convicted of the crimes charged in Counts 1 through 3 of this Indictment, the convicted defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

22.     Pursuant to Title 18, United States Code, Section 982(a)(1), upon being convicted of any of the crimes charged in Counts 4 and 5 of this Indictment, the

*United States v. Kadar*

convicted defendant shall forfeit to the United States any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 and 1957 and any property traceable to such property.

23.   If any of the above-described forfeitable property is unavailable for forfeiture, the United States intends to seek the forfeiture of substitute property as provided for in Title 21, United States Code, Section 853(p) as incorporated by Title 18, United States Code, Section 982(b)(1).

A TRUE BILL

_____          _____
UNITED STATES ATTORNEY                    FOREPERSON


_____
LORINDA LARYEA
Chief
Criminal Division, Fraud Section
U.S. Department of Justice